OPINION
{¶ 1} Appellant, Samie Saleh Al Rakaf, appeals from the judgment of the Portage County Municipal Court, Kent Division, which denied his motion to suppress, finding that the arresting officers had a reasonable articulable suspicion to stop his vehicle and investigate further based on an incident that occurred earlier in the night by another officer. *Page 2 
 {¶ 2} We find this appeal to have merit as we find that the factual findings of the trial court are not supported by competent, credible evidence upon which one could conclude that the arresting officers had a reasonable articulable suspicion to believe a crime had been committed when they stopped Mr. Rakaf.
 {¶ 3} Thus, we find that the trial court erred as its finding that a reasonable suspicion relied heavily on a first stop that occurred earlier in the night. The shaky foundation for this suspicion was a vague description of a vehicle, a brief encounter with a white male in his twenties who was seated in the driver's seat of the vehicle, and inference upon inference that an actual crime had even occurred, the information of which, was relayed to another officer. Based upon that information the officers could have arbitrarily stopped half of the downtown population of Kent that night.
 {¶ 4} We reverse, determining that a mere hunch about a suspect that is vaguely relayed to other officers about a crime that might have occurred, was not enough to constitute a reasonable suspicion to stop Mr. Rakaf s vehicle in this case.
 {¶ 5} Substantive and Procedural History
 {¶ 6} The sole issue before the court at the suppression hearing was whether there was a reasonable articulable suspicion for the stop itself, which occurred at approximately 2:30 a.m. on a Thursday night in downtown Kent, in the vicinity of a popular bar, the Barn.
 {¶ 7} Earlier in the evening around midnight, Officer Schlosser, and his partner, Officer Fuller, were on foot patrol of the downtown area, which was crowded and busy, with cars parked behind a hardware store across the street, as well as along the street in an angled fashion. Officer Schlosser testified that his partner saw a passenger in a *Page 3 
car parked across the street who he believed was drinking out of a bottle of alcohol. Officer Schlosser did not remember the make or model of the vehicle.
 {¶ 8} The officers approached the car, and while Officer Fuller was on the passenger side, asking the passenger for his identification, the passenger attempted to get out of the car. At that time, Officer Schlosser was on the driver's side of the vehicle. He observed a "young male sitting there, and I really hadn't made contact with him because this guy [male in passenger seat] was arguing with Officer Fuller and they're arguing back and forth. The guy pushes Officer Fuller and takes off running." Officer Schlosser then told the "person that I made `contact' with, the driver behind the wheel of the car, to just sit still * * *," so he could join the chase.
 {¶ 9} Officer Schlosser described his "contact" with the driver as lasting for no more than two minutes, and explained that he never got the driver's identification. He did observe that the vehicle was not being operated and that there were no keys in the ignition. When he ran a LEADS check on the vehicle, he did not pull up a photo of the owner.
 {¶ 10} When Officer Schlosser came back from assisting Officer Fuller in apprehending the passenger, who was indeed drunk and underage, the male was gone. The passenger provided no identifying information as to his missing companion.
 {¶ 11} Officer Schlosser then advised Officer Kanieski and Jacobs to "keep an eye out on this car because even though I didn't really have contact with the person behind the wheel of the car it appeared to me that he definitely was under the age of twenty-one and probably under the influence of alcohol and that if they saw the car moving to stop it so I could make contact and see if that would be the same person." *Page 4 
 {¶ 12} Officer Schlosser could not remember if he met with the two other officers who later arrested Mr. Rakaf, or if he dispatched the information over the police radio. He could not give any physical description during his testimony at the hearing besides "[j]ust a young male. This kid probably weighed 115 pounds, dark hair."
 {¶ 13} The following colloquy occurred during Officer Schlosser's crossexamination describing his relay of the information from the initial incident to the other officers:
 {¶ 14} "Defense: * * * You didn't tell them to stop the vehicle?
 {¶ 15} "Officer Schlosser: I only said if they saw it moving to stop it. * * *
 {¶ 16} "Defense: Okay, so no discussion over the actual suspect himself, just the vehicle?
 {¶ 17} "Officer Schlosser: Um, I told them there was a white male and that they took running after I told them to stay where it was at.
 {¶ 18} "* * * *.
 {¶ 19} "Defense: So they stopped the vehicle, so to speak, on their own based on your conversation with them earlier?
 {¶ 20} "Officer Schlosser: That would be one of the reasons why they stopped him that I know of."
 {¶ 21} Officer Kanieski, who was in training at the time and patrolling with Officer Jacobs, testified that he received the information as to the missing male and vehicle over radio dispatch. Dispatch relayed a description of the car and where it was located. While he was driving up East Erie Street, where the vehicle was parked, Officer Jacobs observed a beige Chevy Impala getting ready to back out of a parking spot that *Page 5 
seemingly matched the description of the vehicle. Officer Kanieski opined that the vehicle was dangerously close to hitting another vehicle as the parking spots on East Main Street were on an angle and "pretty tight."
 {¶ 22} The officers blocked the suspect vehicle by parking their patrol vehicle behind Mr. Rakaf's car, and waited until Officer Schlosser arrived on the scene so that he could identify the vehicle and the driver. Upon his approach to the vehicle, Officer Schlosser immediately recognized that the driver was "definitely not" the male he was looking for, but he then approached the vehicle and asked Mr. Rakaf several questions, eventually asking him to step out of the vehicle. Mr. Rakaf was placed in Officer Kanieski's patrol car, and Officer Schlosser told him to run some field sobriety tests because he detected alcohol on Mr. Rakaf's breath and because his speech was "slurry."
 {¶ 23} This was Officer Kanieski's first OVI arrest. He testified that he did not recall getting a license plate number from the dispatch. He simply blocked the vehicle because it was a beige Chevy Impala, which seemed to match the vague description given of the suspect car. He and Officer Jacobs never conducted an independent traffic stop of Mr. Rakaf because he "did not observe any other reason to stop him" and that he was just acting on Officer Schlosser's information. Although Officer Schlosser ran a LEADS check on the vehicle during the first incident and thus had the vehicle's license plate number, he testified that he could not remember if he relayed the license plate number to the arresting officers. Officer Kanieski testified that he was told to look for a beige Chevy Impala. It was on that vague basis that he stopped the vehicle, with no knowledge as to whether this was the specific vehicle involved in the first incident. *Page 6 
 {¶ 24} When asked about the physical description given of the missing male, he replied, "I just remember males in their 20's." The defense then asked, "So that's pretty much half the people downtown at that point?" To which Officer Kanieski replied, "Sure."
 {¶ 25} Officer Kanieski did not cite Mr. Rakaf for any other traffic offense besides the OVI. On the 2255 ALS form, the "reasonable ground" cited for the stop was listed as "field sobriety tests." Moreover, the officer did not note the "near accident" that allegedly occurred when Mr. Rakaf was slowly pulling out of the tight parking spot, which first captured Officer Jacob's attention.
 {¶ 26} After the state presented the testimony of Officer Schlosser and Officer Kanieski, the state rested and the hearing was concluded. The court denied Mr. Rakaf's motion to suppress, finding that the description and instruction given to Officer Jacobs by Officer Schlosser was "to keep an eye on that vehicle and that the person who was sitting in the driver's seat was a white male. Officer Edward Kanieski also was made aware of this request." The court found that "[w]hen Officer Schlosser approached the driver, he noticed it was not the same person he had seen sitting in the driver's seat earlier that morning." The court went on to find that based on the facts of the earlier incident; where the officers found a bottle of alcohol in a vehicle, and determined that the passenger was drinking underage, there was enough reasonable suspicion to conduct an investigatory stop of Mr. Rakaf. The court further stated in its findings that "the passenger not only got out of the vehicle against the orders of the officer, but pushed the officer out of the way and began running. He had to be chased down. The other person left during the chase." *Page 7 
 {¶ 27} The court concluded that "[b]ecause of these facts, the officers had a reasonable articulable suspicion to believe a crime had been committed and had a right to continue that investigation when others got back to the other car. In addition, the driver came very close to causing an accident just prior to being blocked from driving any further."
 {¶ 28} Mr. Rakaf pled no contest to and was found guilty of one count of OVI, in violation of R.C. 4511.19(A)(1)(d).
 {¶ 29} Mr. Rakaf now timely appeals, raising one assignment of error:
 {¶ 30} "[1.] The trial court erred in overruling appellant's motion to suppress."
 {¶ 31} Motion to Suppress Standard of Review
 {¶ 32} "At a hearing on a motion to suppress, the trial court functions as the trier of fact, and, therefore is in the best position to weigh the evidence by resolving factual questions and evaluating the credibility of any witnesses." State v. Maloney, 11th Dist. No. 2007-G-2788, 2008-Ohio-1492, ¶ 19, quoting State v. McGary, 11th Dist. No. 2006-T-0127, 2007-Ohio-4766, ¶ 20, citing State v. Molek, 11th Dist. No. 2001-P-0147, 2002-Ohio-7159, ¶ 24, citing State v. Mills (1992),62 Ohio St.3d 357, 366; see, also, State v. Mustafa, 11th Dist. No. 2000-P-0116, 2001-Ohio-7067, 3-4. "Thus, `[a]n appellate court must accept the findings of fact of the trial court as long as those findings are supported by competent, credible evidence.'" Id., citingMcGary, citing State v. Retherford (1994), 93 Ohio App.3d 586, 592;City of Ravenna v. Nethken, 11th Dist. No. 2001-P-0040, 2002-Ohio-3129, ¶ 13. "After accepting such factual findings as true, the reviewing court must then independently determine, as a matter of law, whether or not the applicable standard has been met." Id. *Page 8 
 {¶ 33} Reasonable Suspicion to Conduct an Investigatory Stop
 {¶ 34} Mr. Rakaf argues that the trial court erred in overruling his motion to suppress because the dispatch the officers relied on was not based upon facts that amounted to a reasonable suspicion of criminal activity, and that the description of the suspect and the suspect's vehicle were not sufficient to give the officers reasonable suspicion to stop Mr. Rakaf's vehicle. Mr. Rakaf further argues that Officer Schlosser's alleged reasonable suspicion for stopping Mr. Rakaf's vehicle dissipated the moment he realized that Mr. Rakaf was not the missing male suspect. Officer Schlosser realized this as he approached the vehicle even before he initiated any contact with Mr. Rakaf.
 {¶ 35} We find Mr. Rakaf's argument to have merit because the information Officer Schlosser relayed to Officers Jacobs and Kanieski was so vague in both the description of the vehicle and the missing male, and whether a crime had even been committed earlier in the night, that it could not form the foundation for an investigative stop. Further, the arresting officers saw no other traffic violation occurring at the time they blocked Mr. Rakaf's car, and admitted they were acting merely on Officer Schlosser's inarticulable hunch or suspicion that a crime had occurred several hours earlier.
 {¶ 36} "In order to conduct an investigatory stop of a motor vehicle, a police officer must have an articulable and reasonable suspicion that the motorist is engaged in criminal activity or is operating his vehicle in violation of the law." State v. Woods, Sr. (Sept. 22, 2000), 11th Dist. No. 99-L-111, 2000 Ohio App. LEXIS 4353, 5, citing Delaware v.Prouse (1979), 440 U.S. 648, 663. "Reasonable suspicion connotes something less than probable cause, but something more than an `inchoate and *Page 9 
unparticularized suspicion or hunch.'" Id., quoting Terry v. Ohio
(1968), 392 U.S. 1. "The propriety of an investigative stop is to be viewed in light of the totality of the circumstances." Id., citingState v. Bobo (1988), 37 Ohio St.3d 177, paragraph one of the syllabus.
 {¶ 37} At the suppression hearing, Officer Kanieski testified that he and Officer Jacobs stopped Mr. Rakaf because his car matched the description given by Officer Schlosser. He took no further investigatory action, instead both officers waited in the patrol car for Officer Schlosser to arrive and identify the vehicle and its occupant. They simply sat in the patrol car blocking Mr. Rakaf from pulling out of his parking spot.
 {¶ 38} Officer Kanieski further testified that he had no other reason to stop Mr. Rakaf. Officer Schlosser realized Mr. Rakaf was not the same suspect as he approached the vehicle before he even had any contact with Mr. Rakaf himself.
 {¶ 39} The description of the suspect given to the officers, whether it was over radio dispatch as Officer Kanieski testified, or in person as Officer Schlosser testified, was that of a male in his twenties. There is conflicting testimony as to the vehicle's description: whether it was a beige Chevy Impala, whether a license plate number was actually ever given to Officers Jacobs and Kanieski, and whether it was an earlier or later model car. Both officers testified the parking lots were crowded and that the physical description given of the missing male could describe about half the population in the downtown area on that busy Thursday night.
 {¶ 40} During the first incident, Officer Schlosser had a less than two minute encounter with the driver, he never asked for identification, and he did not know whether the driver was drinking. Although he knew alcohol was found in the car, he did not *Page 10 
know its exact location, and he knew that the passenger was the only one observed actually drinking from the bottle. Moreover, the car was parked without any keys in the ignition. His articulated suspicion, then, was nothing more than a "hunch" that the missing male was also drinking and underage. Officer Schlosser testified that he relayed the information about the first incident to the officers, saying he did so because it was "[j]ust a young male that I was concerned might be under the influence of alcohol."
 {¶ 41} This case is very similar to Woods, Sr., supra, where we found that the sergeant's decision to stop the appellant was based on merely a hunch that was not supported by a reasonable suspicion because he pulled the suspect over when the only fact that was similar to the description of the suspect was his race. The radio broadcast in that case was much more specific than in this case, as the officers were told to look for an armed robbery suspect, a black male wearing a dark ski and a dark hooded nylon jacket, who had fled on foot. Id. at 6-7. The officer pulled the young man over simply because he was black, as that was the only part of the description given that he matched seeing as how the young man was wearing a fur coat and was driving a vehicle.
 {¶ 42} In the present case, we lack even such a descriptive dispatch. The officers were told to look for a "young white male." As for the vehicle itself, neither Officer Kanieski nor Officer Schlosser could remember if the license plate was actually relayed by Officer Schlosser. Even though Officer Schlosser ran a LEADS check on the vehicle and thus, had the vehicle's license plate number, neither officer could testify that the license plate number was "dispatched" to Officer Kanieski. Officer Kanieski testified *Page 11 
that he stopped Mr. Rakaf from backing out of his parking spot because he was driving a beige Chevy Impala, which met Officer Schlosser's generic description. Although the license plate number was available, the officers were in fact tasked with stopping any beige Chevy Impala based upon solely a hunch. Thus, the officers, observing no traffic violation or having no reasonable articulable suspicion of their own, stopped Mr. Rakaf based purely on Officer Schlosser's vague description and vague suspicion that the missing male might have been an underage drinker and that this missing male had returned.
 {¶ 43} Of course "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be the most reasonable in light of the facts known to the officer at the time." State v. Stack, 11th Dist. No. 2007-A-0090, 2008-Ohio-2134, ¶ 22, citing State v. Feliciano, 11th Dist. No. 2004-L-205, 2006-Ohio-1678, ¶ 22, citing Adams v.Williams (1972), 407 U.S. 143, 145. Thus, we recognize that the "`Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.'" Id.
 {¶ 44} Furthermore, we also recognize that "[t]he officer may rely on information gleaned from valid sources, such as other officers or a police radio dispatch." State v. Williams, 8th Dist. No. 81364, 2003-Ohio-2647, ¶ 10, citing United States v. Hensley (1985),469 U.S. 221. "This principle is rooted in the notion that `effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act *Page 12 
swiftly, and cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information.'" Id., quotingHensley at 231. "When a dispatch is involved, therefore, the officer who conducts the initial stop will typically have very little knowledge of the facts that prompted his or her fellow officer to issue the dispatch." Id.
 {¶ 45} Fundamentally, however, "if a dispatch was issued in the absence of reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth amendment." Id. at ¶ 11, quotingHensley at 232.
 {¶ 46} In the present case, the information that was related to the arresting officers was nothing more than an "inchoate and unparticularized suspicion or `hunch,'" and this does not rise to a reasonable suspicion that the arresting officers could rely on in stopping Mr. Rakaf. Woods, Sr. at 6.
 {¶ 47} Indeed, Officer Schlosser and Officer Kanieski could not even agree on the description of the vehicle that was relayed. Further, the description of the driver was so general that both agreed it described half the individuals present in the downtown area that night. Most fundamentally, Officer Schlosser's observations were based on a mere two minute contact with a male in the driver's seat in the first incident. It is undisputed that the officer did not obtain any identification or even a good description of the missing male. Furthermore, during that brief two minute contact, his attention was diverted by the altercation that was occurring between the passenger and his fellow officer. Thus, Officers Kaneiski and Jacobs were merely acting on another officer's hunch that was described to them in the most vague and ambiguous terms. The officers could have stopped a number of individuals and vehicles that night that would *Page 13 
have met those descriptions and we cannot say that Officer Schlosser's information was based on a reasonable suspicion.
 {¶ 48} Therefore, we determine Mr. Rakaf's argument has merit and that the trial court erred in overruling his motion to suppress because under the totality of the circumstances, this stop was not supported by a reasonable and articulable suspicion, but rather, merely on a hunch that a crime may have occurred involving a missing male suspect described in the most vague and ambiguous terms.
 {¶ 49} Based on the foregoing, the judgment of the Portage County Municipal Court, Kent Division, is reversed.
CYNTHIA WESTCOTT RICE, J., concurs,
TIMOTHY P. CANNON, J., concurs in judgment only with Concurring Opinion.